IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

SARAH KIMBLE                    )
*on behalf of Gabrielle Cynthia Davis, a* )
*minor child*,                  )
                                )
                                )        NO. 3:22-cv-00199
        Plaintiff,              )        JUDGE RICHARDSON
                                )
v.                              )
                                )
WILLIAMSON COUNTY, TENNESSEE,   )
et al.,                         )
                                )
        Defendants.             )

## MEMORANDUM OPINION AND ORDER

Pending before the Court are three motions to dismiss (Doc. Nos. 63, 65, and 70) the

amended complaint (Doc. No. 62). Plaintiff filed a respective response (Doc. Nos. 79, 81, and 83)

to each of the motions to dismiss. Defendants Sheriff Rhoades, Deputy Hollister, Deputy Wiessing,

and Deputy Olson ("Individual Defendants") filed a reply (Doc. No. 84), and Defendant

Williamson County filed a reply (Doc. No. 85). For the reasons stated herein, the motions at Doc.

Nos. 63, 65, and 70 are granted.

## BACKGROUND[1]

This action arises out of sad circumstances. On March 18, 2021, Coty Wayne Davis was

incarcerated at the Williamson County Jail ("Jail") as a pre-trial detainee for misdemeanor

offenses. (Doc. No. 62 at 6). Upon his arrival, he informed Deputy Hollister and Mr. Kenner, a

---

[1] The facts contained in this section are taken from the amended complaint (Doc. No. 62) and are treated as true for the purposes of resolving the pending motions to dismiss.

medical professional[2] and (at all relevant times) an employee of Southern Health Partners, that he used one gram of heroin daily, and that he was currently detoxing.[3] (*Id.*). The Admission Medical Data form noted that Davis was detoxing, and that he appeared to be under the influence of or withdrawing from drugs or alcohol. (*Id.*). Kenner evaluated Davis, including by recording his vital signs, and noted that he had an above-normal resting heartrate, otherwise known as tachycardia. (*Id.* at 7).

Southern Health Partners Inc. ("SHP"), the company employing Kenner, referred Davis to the Jail's general population, despite the Admission Medical Data form appearing to suggest that he be placed in a medical observation unit. (*Id.*). While in general population, Davis was prescribed several medications to treat withdrawal symptoms. (*Id.* at 8). The medications, however, were administered on an inconsistent schedule. (*Id.*). Davis had little contact with SHP staff and was observed minimally during this time. (*Id.*).

Over the course of the four days that Davis spent in the Jail, he got out of his bed for a combined total of approximately three hours. (*Id.*). While lying in bed, he appeared restless. (*Id.*). He did not reach out to anyone outside of the Jail during this time period, and he did not eat much of the meals that were served. (*Id.*). These are all symptoms of withdrawal. (*Id.*).

---

[2] The amended complaint merely states that Mr. Kenner is "medical staff employed by SHP," and therefore the Court is oddly left in the dark as to what type of medical professional Mr. Kenner is. (Doc. No. 62 at 6).

[3] The Cambridge Dictionary provides a pair of definitions of the verb "to detox" that, in the Court's view, collectively adequately reflect what the decedent was referring to here, although the second of these definitions does not precisely fit the circumstances of Davis during his time at the Jail (because it is hardly a "special hospital" for detoxing): (i) "to stop taking unhealthy or harmful foods, drinks, and other substances into your body for a period of time, in order to improve your health" and (ii) "to have medical treatment in a special hospital in order to stop drinking too much  or taking harmful drugs." *See* https://dictionary.cambridge.org/us/dictionary/english/detox?q=detoxing (last accessed March 20, 2023).

The observation notes regarding Davis in the hours before his death reflect five out of twelve responses or observations for symptoms of withdrawal marked as "yes," indicating an increase of withdrawal symptoms experienced by Davis. (*Id.*). Yet, no action was taken based on Davis's decline. (*Id.*).

On March 22, 2021, at approximately 5:17 P.M., Davis committed suicide by hanging himself with a bedsheet in his cell. (*Id.* at 9). Deputy Wiessing, who was assigned to monitor the live feed[4] of Davis's cell, did not notice Davis's actions because he (Deputy Wiessing) was instead tracking the actions of correctional officers. (*Id.*). Davis's body was not discovered for approximately thirty-eight minutes after he hung himself. (*Id.*).

Plaintiff Sarah Kimble now brings federal and state law claims in her capacity as Guardian for Cynthia Davis, the minor child and sole-heir-at-law of Davis. (*Id.* at 1). Plaintiff brings claims under 42 U.S.C. § 1983 against the Individual Defendants in their individual capacities, and against Southern Health Partners, based on alleged violations of Eighth and Fourteenth Amendments. (Doc. No. 62). She also brings § 1983 claims against Williamson County, Tennessee. (*Id.* at 13). Additionally, Plaintiff brings a claim under the Tennessee Healthcare Liability Claim Act against Williamson County, Southern Health Partners, and Individual Defendants. (*Id.* at 16). Plaintiff also brings a § 1983 claim against Brett Kenner in his individual capacity.[5]

---

[4] Neither the amended complaint nor the parties in their briefing make clear what is meant by "live feed," But the amended refers to "a camera in Mr. Davis'[s] cell capturing his activities" just before referring to the "live feed." (Doc. No. 62 at 9). Thus, the Court assumes that the term refers to a real-time visual projection via a video camera, through closed-circuit television or some other technological means.

[5] Kenner is named in the case caption, the amended complaint, and waived service of process in this case (Doc. No. 28). The Court is therefore satisfied that he is a Defendant to this lawsuit and that there remain claims against him in his individual capacity.

Kenner is not a movant on any of the pending motions to dismiss. Furthermore, Southern Health Partners has not moved to dismiss the Tennessee Healthcare Liability Claim Act claim against it. The § 1983 claim against Kenner and the state law claim against Southern Health Partners therefore are unaffected by the instant Memorandum Opinion and Order and will remain pending.

LEGAL STANDARD

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*.; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be

appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bold" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Rule 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.,* 219 F.Supp.3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018).

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir.2008). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim

<u>DISCUSSION</u>

Plaintiff brings claims under § 1983 against Individual Defendants in their individual capacities and against Williamson County, alleging violations of Davis's rights under the Eighth and Fourteenth Amendments. (Doc. No. 62 at 11). As to Individual Defendants, Plaintiff alleges that they were deliberately indifferent to a serious medical need of Davis. (*Id.* at 12). Plaintiff further seeks to impose municipal liability on Williamson County based on a variety of theories discussed further below. (*Id.* at 13–15). Though the amended complaint alleges violations of the Eighth and Fourteenth Amendments, the Court construes Plaintiff's claims as actually being grounded only in the Fourteenth Amendment.

The Eighth Amendment (as made applicable to the states via its incorporation into the Fourteenth Amendment) pertains to inmates serving sentences of imprisonment after conviction. *See Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018) ("The Eighth Amendment provides an inmate the right to be free from cruel and unusual punishment."). By contrast, the Due Process Clause of the Fourteenth Amendment provides the same kind (though not always identical) protection to pre-trial detainees such as Davis. *See id.* ("The Due Process Clause of the Fourteenth Amendment provides the same protections to pre-trial detainees."). Such protection is generally referred to by courts as "Fourteenth Amendment" protection without any reference (beyond an initial reference) to the Due Process Clause. Fourteenth Amendment protection, rather than Eighth Amendment protection, is applicable here because Davis was a pre-trial detainee, not a convicted prisoner.

### 1. Individual Defendants

#### A. Qualified Immunity

Individual Defendants argue that they are entitled to qualified immunity. A defendant's "entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point . . . ." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015) (cleaned up). Thus, the defense of qualified immunity properly can be asserted under Fed. R. Civ. P. 12(b)(6). *E.g.*, *Peatross v. City of Memphis*, 818 F.3d 233, 240 (6th Cir. 2016) ("Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the defendant is entitled to a meritorious affirmative defense such as qualified immunity.").

Qualified immunity protects government officials from civil suits for damages, so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rieves v. Town of Smyrna, Tennessee*, 959 F.3d 678, 695 (6th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Court is required to employ a two-part test to determine whether a government official is entitled to qualified immunity. *Id.* at 695. It must consider (1) whether the official's conduct violated a constitutional right, and (2) whether that constitutional right was clearly established. *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 864 (6th Cir. 2020). Courts are permitted to address these two questions in either order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006); *see also Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. 2019) (" '[T]he plaintiff bears the burden of showing that an officer is not entitled to the defense

of qualified immunity.' ") (quoting *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016)). At the motion-to-dismiss stage, the plaintiff must allege facts that, under existing precedent, would establish beyond debate that the answer to the two questions are "yes" and "no," respectively; otherwise, implicated Section 1983 claims against applicable defendant officials are subject to dismissal based on qualified immunity. Because the Court finds that the amended complaint does not support a claim that the Individual Defendants violated a constitutional right, the Court does not need to reach the second question. Individual Defendants are entitled to qualified immunity, and Plaintiff's § 1983 claims against them are therefore dismissed.

B.  Standard Applied to Plaintiff's Deliberate-Indifference Claim

"Until recently, [the Sixth Circuit] analyzed both pretrial detainees' and prisoners' claims of deliberate indifference 'under the same rubric.'" *Helphenstine v. Lewis Cty., Kentucky*, 60 F.4th 305, 315 (6th Cir. 2023) (quoting *Brawner v. Scott Cty.*, 14 F.4th 585, 596 (6th Cir. 2021)). Generally, a convicted prisoner's Eighth Amendment deliberate-indifference claim consists of an objective and subjective component. *See id.* at 315. "The objective component addresses the conditions leading to the alleged violation." *See id.* (internal quotation marks omitted). "The subjective component, meanwhile, addresses the officials' state of mind." *See id.* (internal quotation marks omitted). Up until *Kingsley v. Hendrickson*, courts generally applied the same state-of-mind requirement to convicted prisoners' § 1983 deliberate-indifference claims that they applied to pre-trial detainees' § 1983 deliberate-indifference claims.

But *Kingsley v. Hendrickson* changed things. In *Kingsley*, the Supreme Court held that pre-trial detainees' excessive force claims must be evaluated under a different standard from that applied to convicted prisoners. *See* 576 U.S. 389, 397–398 (2015). Specifically, the Court in *Kingsley* found that a pre-trial detainee need demonstrate "'only that the force purposely or

knowingly used against him was objectively unreasonable,' rather than *both* objectively and subjectively unreasonable, as a [convicted] prisoner must." *See Helphenstine*, 60 F.4th at 315 (quoting *Kingsley*, 576 U.S. at 396–397).

*Kingsley*, however, resulted in a circuit split on whether *Kingsley*'s holding applied to pre-trial detainees' claims other than claims of excessive force. *See id.* at 316 (collecting cases) ("We appreciate that our sister courts are all over map on this issue. As an initial matter, four circuits have rejected the extension of *Kingsley* to deliberate indifference claims."). In *Brawner v. Scott County*, the Sixth Circuit sought to resolve the "question left open by *Kingsley*"—*i.e.* whether *Kingsley*'s modification of the subjective component applied to pre-trial detainee § 1983 claims beyond those of excessive force. *Brawner v. Scott Cty.*, 14 F.4th 585, 596 (6th Cir. 2021). *Brawner* held that *Kingsley* "required modification of the subjective component of a pre-trial detainee's deliberate indifference claim."[6] *See Helphenstine*, 60 F.4th at 315 (citing *Brawner*, 14 F.4th at 596). According to *Brawner*, a pre-trial detainee seeking to establish deliberate indifference must show that a "defendant 'acted deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known'" *See id.* at 315–316 (quoting *Brawner*, 14 F.4th at 596).

Soon after *Brawner* was decided, however, its holding was called into question by *Trozzi v. Lake Cty.*, 29 F.4th 745 (6th Cir. 2022), relied on in this case by Individual Defendants. In *Trozzi*, the court appeared to negate *Brawner*'s holding that the subjective component of the

---

[6] Although *Kingsley* eliminated the subjective component entirely for pre-trial detainees' § 1983 *excessive-force* claims, *Brawner* framed its extension of *Kinglsey* (to pre-trial detainees' § 1983 claims of *deliberate indifference*) as requiring a modification (rather than elimination) of the subjective component. The practical consequence of this distinction is likely insignificant, however. Though there is some nuance between the standards set forth in *Kingsley* and *Brawner*, at their core, both cases permit a pre-trial detainee to succeed on their § 1983 claim based on what a prison official *should have* known rather than requiring a pre-trial detainee demonstrate what the official actually knew at the time.

deliberate indifference test for pre-trial detainees' § 1983 claims could be established based on something *other* than actual knowledge. 29 F.4th at 757–758.

*Helphenstine* recently set the record straight in: *Brawner*, not *Trozzi*, controls. 60 F.4th at 317. "Accordingly, a plaintiff [bringing a claim for deliberate indifference to a serious medical need], must show (1) that [the plaintiff] had a sufficiently serious medical need and (2) that each defendant "acted deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *See Brawner*, 60 F.4th at 317 (internal quotation marks).

Therefore, Individual Defendants' reliance on *Trozzi* is now outdated,[7] and the Court will apply to Plaintiff's claim the standard set forth in *Brawner*.

### C. Deliberate Indifference to a Serious Medical Need

Plaintiff contends that Individual Defendants were deliberately indifferent to a serious medical need of Davis while he was incarcerated at the Jail. As noted, the amended complaint must contain facts demonstrating that "(1) that [decedent] had a sufficiently serious medical need and (2) that each defendant "acted deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *See Brawner*, 60 F.4th at 317 (internal quotation marks). As discussed below, the Court finds that although Davis presented an objectively serious medical need, the amended complaint does not contain facts supporting a claim that Individual Defendants were deliberately indifferent to that need.

---

[7] The Court does not fault Individual Defendants for their reliance on *Trozzi*. Indeed, at the time they filed their motion to dismiss, *Brawner* had not yet been decided.

###### i. *Whether Davis Suffered an Objectively Serious Medical Need*

An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *See Griffith v. Franklin Cty. Kentucky*, 975 F.3d 554, 567 (6th Cir. 2020) (internal quotation marks omitted).

Though the parties do not dispute that Davis suffered an objectively serious medical need, they appear to disagree on the precise nature of the serious medical need implicated by Plaintiff's § 1983 deliberate-indifference claim. Individual Defendants and Williamson County suggest that Davis's serious medical need was the need to be treated for his risk of suicide.[8] (Doc. No. 64 at 2, 4–5). By contrast, Plaintiff contends that Davis presented an objectively serious medical need to detox from heroin use. (Doc. No. 79 at 3).

Admittedly, the amended complaint is not entirely clear on what precisely was Davis's serious medical need. The amended complaint makes references to Davis being at risk of harm due both to withdrawal[9] and potential suicide. But the Court is satisfied that the amended complaint, read as a whole, suggests that Plaintiff alleges that Davis suffered a serious medical need to detox from heroin rather than a serious medical need related to a risk of suicide.

---

[8] To be sure, "[s]uicidal tendencies are considered serious medical needs within the Sixth Circuit. [] Thus, a plaintiff meets the objective prong of the Eighth [or Fourteenth] Amendment analysis by showing that the inmate showed suicidal tendencies during the period of detention or that he posted a strong likelihood of another suicide attempt." *See Estate of Abbey v. Herring*, 598 F. Supp. 3d 572, 587 (E.D. Mich. 2022).

[9] Though the amended complaint makes several references to "withdrawal," it does not explain what it means by this term. For example, the amended complaint does not explain whether Davis was prevented from using heroin (or similar substances) completely once he became incarcerated the Jail. However, given that heroin is an illicit substance and would (absent incompetence or corruption) be kept from those in custody at the Jail, the Court assumes that "withdrawal" here means a complete cessation of the use of heroin, though the Court could envision that detox involves the use of other legal stimulants (like methadone) to safely assist those attempting to cease their use of a substance like heroin.

Still, there remains a question as to whether Davis suffered an objectively serious medical need while he was a pre-trial detainee. The Court is disinclined to find that "withdrawal, from any substance, at any stage and for every detainee, qualifies as a sufficiently serious medical need." *See Helphenstine v. Lewis County, Kentucky*, No. 18-93, 2022 WL 1433009, at *6 (E.D. Ky. May 5, 2022), *rev'd on other grounds*, 60 F.4th 305 (6th Cir. 2023). However, the amended complaint reflects that Mr. Kenner was aware that Davis was detoxing from heroin use, that Davis received medication presumably for the side-effects of detoxing during his incarceration, and that he remained in contact with Kenner, if not additional medical professionals, while in general population. (Doc. No. 62 at 6–8). Evidently, Davis's detox from heroin was a medical need that was "diagnosed by a physician as mandating treatment."[10] *See Griffith*, 975 F.3d at 567. Therefore, the Court finds that Davis was suffering an objectively serious medical need to detox from heroin use while incarcerated at the Jail.

### ii. *Whether Individual Defendants Were Deliberately Indifferent*

As noted, a defendant is deliberately indifferent to a serious medical need when he or she acts "deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or is so obvious that it should be known." *See Helphenstine*, 60 F.4th at 317 (internal quotation marks omitted). As the Sixth Circuit has recognized, the district court, in assessing whether that defendant was deliberately indifferent, may consider whether a non-medical prison-official defendant reasonably relied on "medical judgments made by medical

---

[10] The Court assumes for the purposes of the objective component that Davis was seen by a physician, given that he was prescribed medication—a responsibility the Court takes to typically be that of a physician.

professionals responsible for prisoner care." *See J.H v. Williamson County, Tennessee*, 951 F.3d 709, 723 (6th Cir. 2020).

a) Deputy Hollister

Individual Defendants argue that the amended complaint does not state sufficient facts as to Deputy Hollister to plausibly suggest deliberate indifference. (Doc. No. 64 at 10). The amended complaint states that Davis informed Deputy Hollister upon his (Davis's) arrival at the Jail that he was using one gram of heroin daily and was detoxing. (Doc. No. 62 at 6). It further states that Davis appeared extremely intoxicated at the time of booking. (*Id.* a 13). The amended complaint contains no additional facts as to Davis's interactions with Hollister. As part of Davis's intake, he was evaluated by Kenner, a medical professional. (*Id.* at 6–7). Individual Defendants argue that in addition to Deputy Hollister having very little interaction with Davis, applicable law permitted him to rely on the treatment decisions of Kenner. (Doc. No. 64 at 10–11).

Plaintiff, by contrast, argues that Hollister was deliberately indifferent because he "knew or should have known of the Tennessee Rules and Regulations regarding detoxication treatment and that the treatment requires the supervision of a physician." (Doc. No. 79 at 6). First, the Court is not persuaded that the amended complaint supports the proposition that the Tennessee Rules and Regulations require the supervision of a *physician* for an inmate who is undergoing detox. The portion of the Tennessee Rules and Regulations excerpted in the amended complaint states that "detoxification from alcohol, opiates. . . shall be conducted under medical supervision. . .." (Doc. No. 62 at 16). The Regulations do not specify that a physician must supervise detoxification. True, the amended complaint states that "SHP policy requires that detoxification be carried out under

*medical supervision* with *physician overview*."[11] (*Id.* at 7) (emphasis added). It goes on to allege, however, that the nurse should have contacted the medical director (whom the Court assumes is a physician) *if* Davis was to be "placed in detox."[12] (*Id.*). The amended complaint therefore suggests that "physician overview" as used in the SHP policy refers to the participation of the medical director. But Davis was not "placed in detox," and therefore it was not necessary for the nurse to contact the medical director. It follows that the amended complaint does not support the proposition, suggested by Plaintiff in her response, that SHP policy required Davis be supervised by a physician.

Second, given that the Tennessee Rules and Regulations require only medical supervision (and *not* "supervision of a physician) (Doc. No. 79 at 6) and the SHP policy appears not to contradict this practice, the obvious flaw in Plaintiff's argument is that the amended complaint itself suggests that soon after Davis informed Hollister that he was withdrawing from heroin, Davis was evaluated by Kenner—a medical professional. Furthermore, from the face of the amended complaint, it is unclear that Hollister ever came face-to-face with Davis again after Davis's initial intake into the jail. Therefore, the Court finds that the amended complaint does not contain facts

---

[11] Though the Court recognizes that SHP's policies are distinct from "Tennessee Rules and Regulations," this reference to the SHP policy contained in the amended complaint is Plaintiff's most specific reference to the role of a physician as prescribed by any relevant policy. Therefore, the Court, construing the amended complaint in favor of Plaintiff, considers this reference even though Plaintiff does not rely on it in her briefing.

[12] Though Plaintiff does not make clear in either the amended complaint or in her response what it means to be "placed in detox" she suggests that Davis's placement in general population means that he was *not* "placed in detox." For example, in her response, Plaintiff states that "deputies failed to have Decedent placed in specialized care at a hospital or detoxification center. Instead, Decedent was placed in the general population, where he committed suicide." (Doc. No. 79 at 7). The amended complaint also includes an excerpt from the Tennessee Rules and Regulations which explains that inmates can be placed in "specialized care at a hospital or detoxification center" if they meet specific criteria. (Doc. No. 62 at 16). To be "placed in detox" therefore appears to mean being sent to receive specialized care at a hospital or detoxification center. This seemingly would necessarily mean that someone (like Davis) placed in general population was *not* "placed in detox."

to support that Deputy Hollister was deliberately indifferent to Davis's need to detox (under the supervision of a physician). Deputy Hollister is therefore entitled to qualified immunity.

b) Deputy Wiessing

The amended complaint states that Deputy Wiessing was assigned to monitor the live feed of Davis's cell and did not notice Davis hanging himself with his bedsheet. (Doc. No. 62 at 9). Instead, Wiessing was allegedly tracking the actions of correctional officers rather than the inmates. (*Id.*). Individual Defendants argue that Wiessing's conduct was at most negligent and thus does not reach the standard of deliberate indifference.

While it is certainly unfortunate (to say the least) that Deputy Wiessing did not see Davis taking steps to prepare for his suicide and therefore did not intervene before Davis hung himself, the Court agrees that Deputy Wiessing's conduct was at most negligent. The amended complaint contains no facts suggesting that Wiessing was aware that Davis was going through a detox from heroin, such that the live feed of his (Davis's) cell needed to be constantly monitored[13]. And Plaintiff does not suggest that Deputy Wiessing had a duty to ensure that Davis was under constant surveillance. *See Amarite v. Greene County, Tennessee*, 2-20-cv-116, 2022 WL 254567, at *7 (E.D. Tenn. Jan. 26 2022) (explaining that plaintiff produced no evidence or authority suggesting that defendants "acted with deliberate indifference by not continuously watching the monitors" of a particular part of the prison to prevent an assault). Therefore, the Court finds that the amended

---

[13] The presence of a camera and corresponding live feed in Davis's cell begs the question of whether there was an expectation that Deputy Wiessing would be closely monitoring Davis's activities. The amended complaint, however, contains no facts (beyond the mere presence of the camera and live feed) to support the notion that Wiessing should have been monitoring Davis at all times. Though the Court can imagine scenarios in which live feeds are implemented specifically to enable jail officials to closely monitor high-risk inmates (such as those who are known to be at risk of suicide), the amended complaint does not suggest that the camera and live feed in Davis's cell was set up for this purpose.

complaint does not contain facts to plausibly suggest that Deputy Wiessing was deliberately indifferent. Deputy Wiessing is therefore entitled to qualified immunity.

### c) Sheriff Rhoades

The amended complaint fails to allege the personal involvement of Sheriff Rhoades in the events described therein. Instead, Plaintiff alleges that Sheriff Rhoades is liable for constitutional violations under § 1983 because he acted in a supervisory capacity over Individual Defendants. (Doc. No. 62 at 13). But even when a plaintiff seeks to bring a claim against a defendant in the defendant's supervisory capacity, the plaintiff must allege that the defendant was "personally involved in the events underlying the suit in order to state plausible claims for relief." *See Bright v. Thompson*, 467 F. App'x 462, 464 (6th Cir. 2012). And as mentioned above, *Iqbal* requires more than "bare assertions, formulaic recitation of the elements, and "conclusory or "bold allegations." *See Iqbal*, 556 U.S. at 681. Therefore, Plaintiff's vague allegation that Rhoades "permitted, encouraged, tolerated, and knowingly acquiesced [in]" an official practice of employees (including Individual Defendants), (Doc. No. 62 at 14), without more, is insufficient to state a claim. Therefore, the Court finds that the amended complaint does not contain facts to plausibly suggest that Sheriff Rhoades was deliberately indifferent. Sheriff Rhoades is therefore entitled to qualified immunity.

### d) Deputy Olson

As pointed out by Individual Defendants, Plaintiff alleges no facts indicating that Deputy Olson was personally involved the events described in the amended complaint, let alone that she was deliberately indifferent to Plaintiff's need to detox. Therefore, the Court finds that the

amended complaint does not contain facts to plausibly suggest that Deputy Olson was deliberately indifferent. Deputy Olson is therefore entitled to qualified immunity.

## 2. Section 1983 Claims Against Williamson County and Southern Health Partners

Municipalities cannot be held liable under Section 1983 on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, a municipality can be liable under Section 1983 only on the basis of so-called *Monell* liability, which requires the plaintiff to establish that: "(1) the plaintiff's harm was caused by a constitutional violation; and (2) the [municipality] was responsible for that violation." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009). Given the second of these requirements, "municipalities are liable for harms resulting from a constitutional violation only when the injury resulted from an 'implementation of [the municipality's] official policies or established customs.'" *Spears*, 589 F.3d at 256 (quoting *Monell*, 436 U.S. at 708 (Powell, J., concurring)) (emphasis in original). *Monell* liability requires a showing that the alleged misconduct is the result of a policy, statement, regulation, decision or custom promulgated by the municipality or its agent. *Monell*, 436 U.S. at 690–91. A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following circumstances: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fisher*, 735 F.3d 462, 478 (6th Cir. 2013).

### A. Williamson County

The amended complaint alleges that Williamson County's "policies practices, and/or customers were moving forces behind constitutional violations" suffered by Davis. It further alleges that Sheriff Rhoades was a (indeed, "the final") "policymaker for Williamson County in

all matters concerning the administration of the Williamson County Jail."[14] (Doc. No. 62 at 14). Even if Plaintiff could establish a constitutional violation[15], Plaintiff has failed to allege facts sufficient to support a claim of municipal liability against Williamson County under *Monell*.

In addition to Plaintiff's allegation that the County's policies were the driving force behind the supposed constitutional violations, the amended complaint sets forth three grounds upon which Plaintiff seeks to hold Williamson County liable:[16]

---

[14] There appears to be confusion among the parties about whether Plaintiff brings claims against Sheriff Rhoades in his official capacity as well as in his individual capacity. Individual Defendants are under the impression that Sheriff Rhoades has been sued only in his individual capacity. (Doc. No. 64 at 12). Plaintiff, on the other hand, appears to believe that she has sued him in his official capacity in addition to his individual capacity. (Doc. No. 82). The Court agrees with Plaintiff that the amended complaint—although not indicating in the caption the capacity in which Sheriff Rhoades is sued—relies on alleged facts suggesting that Sheriff Rhoades is being sued as a defendant both in his individual and official capacities. (Doc. No. 62). Nonetheless, because Plaintiff seeks to hold Sheriff Rhoades in his official capacity responsible for the same set of conduct as Williamson County, the "claims are duplicative of the municipal liability claim lodged against the County." *Carthew v. Cty. Of Suffolk*, 709 F. Supp. 2d 188, 195 (E.D.N.Y 2010). Accordingly, when an employee of an entity is sued in the employee's official capacity, the Court treats the official-capacity claim as a claim against the employer-entity. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . 'generally represent . . . another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). And "[c]ourts within the Sixth Circuit consistently dismiss official-capacity claims against municipal officials that are duplicative of claims asserted by the plaintiff against the municipal entity itself." *Rodgers v. Cty. of Oakland*, No. 18-CV-12832, 2019 WL 3777031, at *4 (E.D. Mich. Aug. 12, 2019).

Sheriff Rhoades is a movant on the Individual Defendants' motion to dismiss (Doc. No. 63) and, in the accompanying memorandum to the County's motion dismiss, briefly addresses the arguments against him that support claims against him in his official capacity (Doc. No. 66). Given Sheriff Rhoades' status as a movant on the Individual Movants' motion to dismiss and the overlap of the claims against him in his official capacity and the claims against Williamson County, the Court is satisfied that the claims against Sheriff Rhoades in his official capacity should be dismissed as duplicative of the claims against Williamson County.

[15] Although the Court has dismissed, via this memorandum opinion and order, the majority of Plaintiff's § 1983 claims, the § 1983 claim against Kenner remains pending and could conceivably serve as the basis for a *Monell* claim against Williamson County.

[16] To the extent that the amended complaint relies on theories of municipal liability based on the County's alleged acquiescence to unconstitutional conduct or Sheriff Rhoades' alleged ratification of unconstitutional conduct of the Jail's employees, the Court finds that the amended complaint does not contain facts to support these theories of liability. Particularly as to Plaintiff's argument that Sheriff's Rhoades ratified unconstitutional conduct, even assuming that the amended complaint establishes Sheriff

Defendants failed to adequately and properly train and educate its officers with respect to identifying the special needs of individuals placed in their custody, properly searching individuals entering its facility, properly observing, and reporting abnormal behavior consistent with its own written policies indicating individuals who may self-harm;

Defendants failed to properly discipline its officers with respect to violations of the laws of the State of Tennessee, the Constitution of the United States, and its own policies regarding with respect to violations of policy and Tennessee state regulation and creating a pattern, policy, practice, custom or atmosphere where such negligent, reckless and unconstitutional behavior is tolerated, condoned and accepted by in deliberate indifference and reckless disregard to the public at large, including Mr. Davis; and

Defendants failed to adequately monitor and evaluate the performance of its officers and their compliance with the laws and policies, practices, and customs with respect to violations of policy and Tennessee state regulations, deliberate indifference, and reckless disregard to the public at large, including Mr. Davis.

(Doc. No. 62 at 14–15). The amended complaint does not contain facts supporting any of these conclusory allegations. True, the amended complaint states that the Tennessee Corrections Institute Chapter 1400-01 Minimum Standards for Local Adult Facilities requires that:

Detoxification from alcohol, opiates, hypnotics, and other stimulants shall be conducted under medical supervision in accordance with local, state, and federal laws. When performed at the facility, detoxification shall be prescribed in accordance with clinical protocols approved by the health authority. Specific criteria shall be established for referring symptomatic inmates suffering from withdrawal or intoxication for more specialized care at a hospital or detoxification center."

(*Id.* at 16 (quoting Tenn. Comp. R. & Regs. § 1400-01-.13(16)). But the amended complaint contains several facts indicating that Davis *was* under medical supervision during his incarceration. (Doc. No. 62). The amended complaint describes Davis as being subject to a "treatment plan," being prescribed medication, and having his medical records updated "at least daily" based on his

Rhoades had final decision-making authority (as is required to be a "ratifier"), the amended complaint fails to demonstrate that Sheriff Rhoades ratified any of the Individual Defendants' conduct—an essential aspect of the ratification theory of liability. *See Christie v. Iopa*, 176 F.3d 1231, 1238–1239 (9th Cir. 1999).

symptoms.[17] (*Id.* at 7, 8, 9). Further, the amended complaint does not allege that Davis fulfilled the specific criteria necessary to be referred to a hospital or detoxification center under the policy.

Plaintiff further alleges that SHP policy requires that detoxification be carried out under medical supervision with physician overview, and that the nurse should have contacted the medical director if Davis had been "placed in detox and administered medicine." (*Id.* 62 at 7). Even assuming that Williamson County could be liable for non-compliance with an SHP policy, Davis *was* under the supervision of at least one medical professional (Kenner), and contacting the medical director was unnecessary under the policy because Davis was not placed in detox.

The Court acknowledges that the amended complaint contains a few statements that suggest that certain SHP or Jail policies were not followed. For example, the amended complaint states that jail officials had minimal contact with Davis, which was "not consistent with what purports to be the policy of SHP." (*Id.* at 8). But the amended complaint elsewhere contradicts this assertion—it asserts that the encounter notes that log Davis's withdrawal symptoms were "completed at least daily." (*Id.* at 7).

The amended complaint further states that after Davis exhibited a decline in withdrawal symptoms, Kenner did not contact the "medical director or anyone else to report the decline . . . ." (*Id.* at 8). Nowhere is it alleged, however, that this was done contrary to SHP policy or due to a failure to train.

Ultimately, the amended complaint fails to allege facts plausibly suggesting that Williamson County had policies that were the driving force of the supposed constitutional

---

[17] Though Kenner is the only medical professional identified by name in the amended complaint, it is unclear from the face of the amended complaint whether Davis was under the supervision of medical professionals other than Kenner during his incarceration.

violations, or to plausibly suggest the existence of the additional three grounds (failures) listed above that could in theory support a claim of municipal liability against Williamson County.

### B. Southern Health Partners ("SHP")

Plaintiff alleges that SHP is liable under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment on the doctrines of "agency, vicarious liability, employer-employee relations, master-servant, respondeat superior, joint venture, contract and because of its non-delegable duty to comply with the Constitution and laws of the United Sates [sic] and the State of Tennessee." (Doc. No. 62 at 13). According to the amended complaint, SHP is the entity which provides medical and psychological care for inmates incarcerated at Williamson County Jail. (*Id.* at 4–5).

"Because Southern Health performs a traditional state function in providing medical care to state inmates, Southern Health acts under the color of state law." *See Burnett v. Rhoades*, 3-22-cv-00223, 2022 WL 2707731, at *4 (M.D. Tenn. Jul. 12, 2022). Thus, it is an entity capable of bearing liability under Section 1983. "In order for Southern Health to be liable under Section 1983, the plaintiff must allege that there is a direct causal link between a policy or custom of Southern Health and the alleged constitutional violation." *Id.* at *4 (citing *Monell*, 436 U.S. at 691). "To hold Southern Health liable, the plaintiff cannot rely on the theory of respondeat superior or vicarious liability." *See id.*

SHP argues that Plaintiff has failed to allege "any facts to show that any alleged constitutional violation resulted from a policy or custom of" SHP. (Doc. No. 71 at 4). In her response, Plaintiff asserts that Kenner was deliberately indifferent to Davis's medical need for detoxification, and that SHP did not properly train Kenner. (Doc. No. 83 at 2–3).

Because SHP can be held liable under § 1983 based only on its conduct with regard to its policies, Kenner's conduct is simply irrelevant to SHP's liability unless his conduct was in

furtherance of an SHP policy or custom. Plaintiff in her response argues that SHP failed to train Kenner in its policies, which (according to Plaintiff) resulted in the alleged constitutional violation. And a failure-to-train theory is a valid basis on which to bring a § 1983 claim against an entity, such as SHP. *See Shadrick v. Hopkins Cty, Kentucky*, 805 F.3d 724, 737 (6th Cir. 2015) (discussing failure-to-train standard as applied to SHP). However, Count I of the amended complaint—the count in which Plaintiff details her § 1983 claims against Individual Defendants and SHP—says nothing about failure to train. (Doc. No. 62 at 11). And "it is an axiomatic rule that a plaintiff may not amend [her] complaint in [her] response brief." *United States ex rel. Sibley v. Univ. Chicago Med. Cent.*, 486 F. Supp. 3d 1210 (N.D. Ill. 2020) (internal quotation marks and citation omitted).

Plaintiff further contends that her § 1983 clams against SHP should survive because SHP was carrying out a "non-delegable duty" of Williamson County in providing medical care to Davis. (Doc. No. 83). Plaintiff's argument on this point is incoherent. Plaintiff attempts to apply the rule of law (from *Davis v. Came-Wyman Lumber Co.*, 150 S.W. 545 (Tenn. 1912)), that an employer may be liable for the conduct of an independent contractor if the injury was due to a violation of a non-delegable duty of the employer. But even if this rule were to apply to § 1983 claims—an application for which Plaintiff provides no support—that would mean only that the *County* could be liable for SHP's conduct due to contracting with SHP; it would suggest nothing about SHP's liability (or lack thereof).

Therefore, Plaintiff has failed to state a claim against SHP under § 1983, and her § 1983 claim is therefore dismissed.

### 3. Tennessee Healthcare Liability Act ("THLA")

Plaintiff brings a claim under the Tennessee Healthcare Liability Act against Williamson County, Southern Health Partners, and Individual Defendants. (Doc. No. 62 at 15). Only

Williamson County and Individual Defendants move to dismiss the claim. (Doc. Nos. 66 at 15, 64 at 14). As the undersigned as previously explained,

> In a health care liability action under the THLA, the claimant must prove three elements: (1) the recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred; (2) that the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with that standard; and (3) as a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred. Tenn. Code. Ann. § 29-26-115(a). Thus, a plaintiff must establish the standard of acceptable care, a breach of that standard, and injury proximately caused by that breach.

*West v. United States*, 502 F. Supp. 3d 1243, 1251 (M.D. Tenn. 2020). Plaintiff has failed to allege facts plausibly suggesting the existence of a valid claim under the THLA. Assuming that the few policies cited by Plaintiff in the amended complaint could fulfill the first element of a claim under the THLA, the amended complaint is otherwise devoid of facts supporting a plausible claim that Williamson County or Individual Defendants breached a duty of care to Davis, as required by the second element. Indeed, the facts alleged in the amended complaint suggest that Davis remained under medical supervision during his incarceration as required by County and SHP policies, and that the Individual Defendants who interacted with Davis during his incarceration acted reasonably in light of the judgment of medical professionals and the information that they knew of Davis's condition at the time. Therefore, Plaintiff fails to state a claim against Williamson County and Individual Defendants under the THLA.

<u>CONCLUSION</u>

For the reasons stated herein, the motions at Doc. Nos. 63, 65, and 70 are GRANTED. Plaintiff's THLA claim against Southern Health Partners and § 1983 claim against Kenner remain pending.

IT IS SO ORDERED.


ELI RICHARDSON
UNITED STATES DISTRICT JUDGE